# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
J.H., et al.,                      )
                                   )
            Plaintiffs,            )
                                   )
            v.                     )          1:21cv856
                                   )
HARFORD MUTUAL INSURANCE,          )
GROUP, INC., et al.,               )
                                   )
            Defendants.            )
```

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on (i) "Defendants' Motion for Judgment on the Pleadings" (Docket Entry 28) (the "Defendants' Motion") filed by Harford Mutual Insurance Group, Inc. ("HMIG"), and The Harford Mutual Insurance Company (individually, "Harford Mutual," and collectively with HMIG, the "Defendants" or "Harford Insurers") and (ii) "Plaintiffs' Motion for Judgment on the Pleadings" (Docket Entry 30) (the "Plaintiffs' Motion") filed by J.H., E.H., and Erica Chambers (collectively, the "Plaintiffs").[1] For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion and Plaintiffs' Motion (collectively, the "Motions.")[2]

---

1 Federal Rule of Civil Procedure 5.2(a)(3) mandates the use of initials when referring to J.H. and E.H., minors.

2 Pursuant to the parties' consent, Chief United States District Judge Thomas D. Schroeder referred this case to the undersigned United States Magistrate Judge for all proceedings. (See Docket Entry 38 at 1.) [Docket Entry page citations utilize the CM/ECF footer's pagination.]

## BACKGROUND

This case concerns insurance coverage for an automobile accident involving Plaintiffs and Carlos Alberto Ramirez (at times, "Ramirez"), an employee of N.C. Champions Construction, Inc. ("NC Champions"). (See, e.g., Docket Entry 22 (the "Amended Complaint") at ¶¶ 2-6, 22, 26-30, 39.) Plaintiffs sued Ramirez, NC Champions, and Big Boss Construction, Inc. ("Big Boss") in North Carolina state court (the "Underlying Litigation") to recover for injuries associated with that accident. (See, e.g., Docket Entry 22-1 (the "State Complaint") at 1-21; see also Docket Entry 22-6 (the "Litigation Agreement") at 1.)[3] According to a Litigation Agreement between, inter alia, Plaintiffs, Defendants, Ramirez, NC Champions, and Big Boss (the "Litigation Agreement Parties"):[4]

"On October 27, 2018, Plaintiff[s] . . . were involved in a motor vehicle collision with Mr. Ramirez," who "was operating a vehicle owned by Big Boss on his way to an NC Champions job site." (Docket Entry 22-6 at 1.) "Harford Mutual issued a commercial general liability policy to NC Champions with policy number 9180396, with a policy period of October 17, 2018, to October 17,

_____

3    For legibility purposes, this Opinion omits the words (i) "the" in front of "Plaintiffs" and "Defendants" and (ii) "Defendant(s)" in front of Ramirez, NC Champions, and Big Boss in all quotations from the parties' materials.

4    Plaintiffs attached the Litigation Agreement to, and relied upon it in, their Amended Complaint. (See, e.g., Docket Entry 22, ¶¶ 6-8, 19.)  Defendants likewise relied upon the Litigation Agreement in their Answer. (See, e.g., Docket Entry 25, ¶¶ 3-6.)

2

2019 (the 'NC Champions Policy')." (Id.) Harford Mutual also "issued a commercial general liability policy to Big Boss with policy number 9178686, with a policy period of August 26, 2018, to August 26, 2019 (the 'Big Boss Policy')." (Id.) In addition, "Harford Mutual issued a commercial excess umbrella liability policy to Big Boss with policy number 7981019, with a policy period of August 26, 2018, to August 26, 2019 (the 'Big Boss Excess Policy')." (Id.) "The Big Boss Excess Policy was renewed for the policy period of August 26, 2019, to August 26, 2020, with policy number 7984663 and using the same language, forms, endorsements, and exclusions." (Id.)

Plaintiffs also initiated a declaratory judgment action in state court "seeking a declaration that coverage for the damages alleged in the Underlying Litigation exists under the NC Champions Policy, the Big Boss Policy, and the Big Boss Excess Policy." (Id.) "The Harford Insurers removed the declaratory judgment action to [this Court], on November 4, 2021, with case number 1:21-CV-856 (the 'Declaratory Judgment Action')." (Id. at 1-2.)[5] Although "there remains an actual and justiciable dispute between the Harford Insurers and Plaintiffs as to the availability of coverage for the Underlying Litigation," through the Litigation Agreement, the "[Litigation Agreement] Parties s[ought] to resolve

_____

5 Per the Amended Complaint, coverage under the Big Boss Policy "is not at issue in this Declaratory Judgment Action." (Docket Entry 22 at 10 n.1.)

the Underlying Litigation, while framing the remaining coverage issues." (Id. at 2.) Accordingly, the Litigation Agreement Parties "agree[d] to a Consent Judgment against Big Boss, NC Champions, and Carlos Alberto Ramirez in the amount of $3,200,000.00." (Id.)

In paragraph 4 of the Litigation Agreement, the Litigation Agreement Parties agreed to pay Plaintiffs $200,000, from various sources, within 21 days of executing the Litigation Agreement. (Id. at 3.) They further

> agree[d] that the Harford Insurers may also be obligated to pay additional monies over the amount set forth in paragraph (4)(c) to Plaintiffs depending on the outcome of the Declaratory Judgment Action. If the Court determines that coverage exists under the Harford insurance policy(ies), then the Harford Insurers are obligated to tender the limits of insurance under the policy or policies that provide coverage, if any, as determined by the Court, the amount of such limits to be decided by the Court, but in no event shall the Harford Insurers be obligated to tender more than $1,000,000.00 under the NC Champions Policy (No. 9180396) and/or $2,000,000.00 under the Big Boss Excess Policy (No. 7981019).

(Id. at 4.) However, "[i]f the Court determines that there is not coverage under the Harford policies, then there will be no recovery by Plaintiffs over and above the amounts set forth in paragraph (4)." (Id.)

Finally, the Litigation Agreement Parties "agree[d] that all facts and conclusions of law pled in the [State] Complaint in the

4

Underlying Litigation are deemed admitted." (Id. at 2.)  According
to the State Complaint:[6]

"Ramirez was at all times relevant hereto an agent, servant,
and/or employee of, or a joint venture partner with NC Champions
and/or Big Boss, and was acting in such capacity and in the course
and scope of his employment, agency and/or joint venture with NC
Champions and/or Big Boss."  (Docket Entry 22-1, ¶ 10.)[7]  On the
morning of October 27, 2018, Plaintiffs occupied a car traveling
south on NC 49 near Burlington, North Carolina, while Ramirez drove
a vehicle north on NC 49 near Burlington, North Carolina.  (See
id., ¶¶ 13-15.)  "As the vehicles approached from opposite
directions, Ramirez, suddenly and without warning[,] crossed the
center line of the highway into Plaintiffs' lane of travel and
violently struck their vehicle head on."  (Id., ¶ 22.)  "As a
result of the collision . . ., Plaintiffs were severely and
permanently injured as a proximate result of the wreck which is the
subject of th[e Underlying L]itigation."  (Id., ¶ 23.)

---

6  In the Amended Complaint, "Plaintiffs incorporate[d] by
reference all stipulated and agreed facts and conclusions of law
pled in the [State] Complaint."  (Docket Entry 22, ¶ 24.)  In their
Answer, Defendants similarly "admit[ted] that the facts set forth
in the [State] Complaint in the Underlying [Litigation] were
admitted pursuant to the terms of the Litigation Agreement."
(Docket Entry 25, ¶¶ 4, 5.)

7  "Alternatively, Ramirez was at all times relevant hereto an
independent contractor which NC Champions negligently hired or
retained."  (Id., ¶ 11.)

5

At the time of the wreck, Ramirez lacked "a valid driver's license and was not authorized to drive a motor vehicle in the United States." (Id., ¶ 16.) "The motor vehicle operated by Ramirez was registered to and owned by Big Boss." (Id., ¶ 17.) Big Boss and NC Champions "knew or should have known that Ramirez did not have a valid driver's license and was not legally authorized to drive a motor vehicle in the United States." (Id., ¶¶ 19, 21.) Nevertheless, "Ramirez was operating the motor vehicle with the express or implied permission and consent of, and while acting within the course and scope of his employment and/or agency with," Big Boss and NC Champions. (Id., ¶¶ 18, 20.)

"At all times relevant hereto, NC Champions hired Ramirez and his co-worker, Jose Miguel Mondragon, to perform siding construction work for NC Champions at NC Champions residential construction sites." (Id., ¶ 46.) "As part of his work, Ramirez worked on a three-man crew with his co-workers Jose Miguel Mondragon Suarez and Jonathan Caleb Gonzales Castillo." (Id., ¶ 47.) Robert Hernandez, Jr. (at times, "Hernandez, Jr."), the owner of NC Champions, knew of the crew's composition and arrangement. (Id.) "Upon information and belief, none of the[] men [on the crew] had a driver's license issued in the United States or were otherwise legally authorized to drive in the United States." (Id.) "For several years before the collision at issue in th[e Underlying Litigation,] Ramirez and his co-worker Jose

6

Miguel Mondragon Suarez traveled together to work for NC Champions at NC Champions work sites, together with another co-worker Jonathan Caleb Gonzales Castillo, an arrangement known to [Hernandez, Jr.]." (Id., ¶ 63.)

The State Complaint continues:

> On the day before the collision at issue in th[e Underlying Litigation,] NC Champions, through its owner [Hernandez, Jr.], provided the work crew, including Ramirez and Mondragon Suarez, with a motor vehicle to transport workers, materials, and/or equipment to an NC Champions worksite to perform work for NC Champions the following day.

(Id., ¶ 64.) "Neither Ramirez nor Mondragon Suarez possessed legal authority to drive motor vehicles in the United States." (Id., ¶ 65.) "When Hernandez, Jr. provided the motor vehicle to the work crew, he knew or reasonably should have know that Ramirez and his co-worker, Mondragon Suarez, were not legally authorized to work, or drive motor vehicles in the United States." (Id., ¶ 66.) When it provided them with the vehicle, "NC Champions knew or reasonably should have known [that] Ramirez and his co-worker, Jose Miguel Mondragon Suarez, were inexperienced, incompetent, unskilled, and unsafe drivers, and did not have legal authority to work, or operate motor vehicles, in the United States." (Id., ¶ 57.) "Hernandez, Jr. did not ask Ramirez or Mondragon Suarez whether either was legally authorized to drive motor vehicles in the United States, or otherwise make reasonable inquiries into their authority

7

or ability to drive motor vehicles, before providing the motor vehicle to the work crew." (Id., ¶ 67.)

"When Hernandez, Jr. provided the motor vehicle to the work crew, he did not place any limitations on their use of the truck, or otherwise restrict their ability to determine who would drive it to the NC Champions work site the following day." (Id., ¶ 68.) "On the day of the collision at issue in th[e Underlying Litigation], Mondragon Suarez asked Ramirez to drive the truck given to them by NC Champions to the NC Champions work site." (Id., ¶ 69.) "At the time of the collision . . .[,] Ramirez was driving the motor vehicle provided to the work crew by NC Champions, and was on his way to work for NC Champions at an NC Champions work site." (Id., ¶ 70.) "NC Champions owed a duty to the motoring public to not authorize or permit any motor vehicle it owned or controlled to be driven by any person who had no legal authority to do so." (Id., ¶ 71.) "NC Champions breached this duty, and was negligent in giving possession of the motor vehicle to the work crew, including Ramirez and Mondragon Suarez before the collision . . ., in violation of [North Carolina General Statute] § 20-34" (id., ¶ 72), which provides that "[n]o person shall authorize or knowingly permit a motor vehicle owned by him or under his control to be driven by any person who has no legal right to do so or in violation of any of the provisions of the Uniform Driver's

8

License Act" (id., ¶ 80 (brackets and internal quotation marks omitted)).

"Ramirez's inexperience, [his] incompetent, habitually careless or reckless driving, and [his] lack of legal authority to drive in the United States was [sic] a proximate cause of Plaintiffs' injuries." (Id., ¶ 73.) Additionally:

> By providing the work crew, including Ramirez and Mondragon Suarez, with a motor vehicle to drive to work for NC Champions, without limitations, when NC Champions knew or reasonably should have known that both Ramirez and his co-worker Jose Miguel Mondragon Suarez traveled to work together, were inexperienced, incompetent, unskilled, and unsafe drivers, and did not have legal authority to work, or operate motor vehicles in the United States, it was reasonably foreseeable to NC Champions that Ramirez would drive the motor vehicle provided by NC Champions, and that a wreck such as the one at issue in th[e Underlying Litigation] could occur.

(Id., ¶ 74.) "As a direct and proximate result of NC Champions' negligent entrustment of the motor vehicle to the work crew, including Ramirez and his co-worker, Jose Miguel Mondragon Suarez, Plaintiff[s] . . . suffered severe and permanent injuries, including, but not limited to, medical expenses, lost wages, loss of income, permanent scarring and disfigurement, and pain and suffering." (Id., ¶ 75; see also id., ¶ 76.) "NC Champions'[s] entrustment of the motor vehicle to the work crew, including Ramirez and his co-worker Jose Miguel Mondragon, in violation of [North Carolina General Statute Section] 20-34 was [also] a proximate cause of Plaintiffs' injuries." (Id., ¶ 87.) NC

9

Champions's violation of this statute "constitutes negligence *per se*." (<u>Id.</u>, ¶ 83.)

Further, "[u]pon information and belief, at the time and place of the wreck at issue in th[e Underlying Litigation]," (i) "Big Boss owned and was the registered owner of the motor vehicle operated by Ramirez," (ii) "Big Boss knew or should have known that Ramirez did not have a valid driver's license," (iii) "Big Boss voluntarily gave possession of the motor vehicle to Ramirez," (iv) "Ramirez was an unlicensed driver, not authorized to drive a motor vehicle in the United States, incompetent, habitually careless or reckless, and likely to cause injury to others in operating a motor vehicle[,] and" (v) "Big Boss knew, or by the exercise of due care should have known, that Ramirez was an unlicensed driver, not legally authorized to drive a motor vehicle in the United States, incompetent, habitually careless or reckless driver, and likely to cause injury to others in operating a motor vehicle." (<u>Id.</u>, ¶ 91.) "Big Boss was negligent in giving possession of its motor vehicle to Ramirez." (<u>Id.</u>, ¶ 92.) "Ramirez's inexperience, [his] incompetent, habitually careless or reckless driving, and [his] lack of legal authority to drive in the United States was [sic] a proximate cause of Plaintiffs' injuries." (<u>Id.</u>, ¶ 93.) "Big Boss's negligent entrustment of its motor vehicle to Ramirez was a proximate cause of Plaintiffs' injuries." (<u>Id.</u>, ¶ 94.)

10

Following the accident, Big Boss submitted a claim for coverage under the Big Boss Excess Policy. (See Docket Entry 22-5 at 1; see also, e.g., Docket Entry 22-1 at 22 (identifying attorney for Big Boss).) On November 27, 2019, the Harford Insurers denied that claim on the basis of the Big Boss Excess Policy's "Automobile Liability Exclusion." (Docket Entry 22-5 at 1.) That provision states: "It is agreed this policy shall not apply to any liability for bodily injury, personal injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of any automobile." (Docket Entry 22-4 at 48 (the "Automobile Exclusion") (emphasis omitted).)[8] Notably, though, the Big Boss Excess Policy also contains an "Aircraft, Unmanned Aircraft and Watercraft Liability Exclusion" (id. at 29 (the "Aircraft/Watercraft Exclusion") (all-cap font and emphasis omitted)), which provides, in relevant part, that no coverage exists (see id. at 4, 6) for:

Bodily injury, property damage, personal injury or advertising injury arising out of the ownership, maintenance, operation, use, loading or unloading or entrustment to others of any aircraft, unmanned aircraft or watercraft.

_____

8  The Amended Complaint attached a copy of Big Boss's 2019-2020 excess umbrella policy (see id. at 1), but Defendants "admit[ted] that the language of policy number 7984663, which is attached as Exhibit 4 to the Amended Complaint, is identical to commercial excess umbrella policy number 7981019, which had a policy period of August 26, 2018, to August 26, 2019, and which was in effect on October 27, 2018" (Docket Entry 25, ¶ 53).

11

> This exclusion applies even if the claims against
> any insured allege negligence or other wrongdoing in the
> supervision, hiring, employment, training or monitoring
> of others by that insured, if the occurrence which caused
> the bodily injury, property damage, personal injury or
> advertising injury involved the ownership, maintenance,
> operation, use, loading or unloading or <u>entrustment to</u>
> <u>others</u> of any aircraft, whether manned or unmmaned, or
> watercraft that is owned or operated by or rented or
> loaned to any insured.

(<u>Id.</u> at 29 (emphasis omitted) (emphasis added).)

In December 2020, the Harford Insurers likewise denied coverage to NC Champions on the basis of the NC Champions Policy's "Aircraft, Auto or Watercraft" (Docket Entry 22-3 at 2 (emphasis omitted)) exclusion. (<u>See</u> <u>id.</u> at 1-3.) As relevant here, in Paragraph g.(2), that exclusion precludes coverage for:

> "Bodily injury" or "property damage" arising out of
> the ownership, maintenance, use or entrustment to others
> of any aircraft (other than "unmanned aircraft"), "auto"
> or watercraft owned or operated by or rented or loaned to
> any insured.  Use includes operation and "loading or
> unloading".

> This Paragraph g.(2) applies even if the claims
> against any insured allege negligence or other wrongdoing
> in the supervision, hiring, employment, training or
> monitoring of others by that insured, if the "occurrence"
> which caused the "bodily injury" or "property damage"
> involved the ownership, maintenance, use or entrustment
> to others of any aircraft (other than "unmanned
> aircraft"), "auto" or watercraft that is owned or
> operated by or rented or loaned to any insured.

(Docket Entry 22-2 at 61.)

However, the NC Champions Policy also includes a "Hired Auto and Non-Owned Auto Liability" endorsement, found on Form GLHM02, which deletes the "Aircraft, Auto or Watercraft" exclusion in the

12

context of "hired" and "non-owned" automobiles. (<u>Id.</u> at 89 (the "Endorsement")).) The Endorsement further specifies that "[t]he insurance provided under COVERAGE A (Section I) applies to 'bodily injury' or 'property damage' arising out of the maintenance or use of a 'hired auto' by you or your employees in the course of your business" and that "[t]he insurance provided under COVERAGE A (Section I) applies to 'bodily injury' or 'property damage' arising out of the use of any 'non-owned auto' in your business by any person other than you." (<u>Id.</u>)[9]

For its part, Section I provides:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

*****

b. This insurance applies to "bodily injury" and "property damage" only if:

---

9 The Endorsement defines "'hired auto'" as "any 'auto' you lease, hire, or borrow," except for "any 'auto' you lease, hire, or borrow from any of your employees or members of their households, or from any partner or executive officer of yours." (<u>Id.</u>) It defines "'non-owned auto'" as "any 'auto' you do not own, lease, hire, or borrow which are used in connection with your business," with the caveat that, "if you are a partnership[,] a 'non-owned auto' does not include any auto owned by any partner." (<u>Id.</u>)

13

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

(Id. at 42.)

During the policy year, NC Champions and the Harford Insurers amended the NC Champions Policy to include the Endorsement. (See id. at 17.) The "Endorsement Summary" lists the pertinent policy number and the name and address of the insured and insurance agency, and specifies that it involved "Renewal of: New" insurance. (Id. (all-cap font and emphasis omitted).) As relevant here, the Endorsement Summary further states:

**Policy Period: From** 10/17/2018 **to** 10/17/2019 **at** 12:01 A.M. Standard Time at your mailing address shown above. **In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.**

FORM OF BUSINESS: BUSINESS ORGANIZATION OTHER THAN PARTNERSHIP OR JOINT VENTURE
BUSINESS DESCRIPTION: SIDING INSTALLATION This endorsement is effective 02/11/2019.

POLICY IS AMENDED TO ADD HIRED/NON OWNED TO THE POLICY PER FORM GLHM02.

14

(Id. (all-cap font, emphasis, and formatting in original).)[10]

Finally, in an "Important Policyholder Information Concerning Billing and Policy Fees" section, the NC Champions Policy provides:

> Endorsements: All endorsements, both additional and return premiums, will be spread over the remaining installment payment periods based on the effective date of the endorsement. If an endorsement is processed with a retroactive effective date, the impact on the next billing statement will be greater than the impact on the remaining installments.

(Id. at 35 (all-cap font and emphasis omitted).)

After entering into the Litigation Agreement, Plaintiffs filed the Amended Complaint. (See Docket Entry 22, ¶¶ 6-8; see also Docket Entry 22-6 (containing Litigation Agreement).) According to the Amended Complaint:

"The Big Boss [Excess Policy] provides coverage for 'bodily injury' caused by an 'occurrence' within the 'coverage territory.'" (Docket Entry 22, ¶ 57.) "The Big Boss [Excess Policy] defines 'bodily injury' as 'bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.'" (Id., ¶ 58.) "The injuries suffered by Plaintiffs in the collision involved in the Underlying [Litigation] constitute 'bodily injury' as that term is defined by the Big Boss [Excess Policy]." (Id., ¶ 59.) "The Big Boss [Excess Policy] defines 'occurrence' as 'an accident, including continuous or repeated

---

10  The Endorsement Summary later confirms that the coverage extends to both "Hired Auto and Non-Ownership Liability." (Id. at 20.)

15

exposure to substantially the same general harmful conditions.'" (Id., ¶ 60.) "The collision involved in the Underlying [Litigation] constitutes an 'occurrence' as that term is defined by the Big Boss [Excess Policy]." (Id., ¶ 61.) "The Big Boss [Excess Policy] defines 'coverage territory' in part as 'the United States of America (including its territories and possessions), Puerto Rico and Canada.'" (Id., ¶ 62.) "The 'occurrence' involved in the Underlying [Litigation] took place within the 'coverage territory' applicable to the Big Boss [Excess Policy]." (Id., ¶ 63.) "The Big Boss [Excess Policy] provides broader coverage than the general liability policy through language stating that Harford Mutual will pay claims for bodily injury which are 'covered by this policy but not covered by [the Big Boss Policy]." (Id., ¶ 64; see id., ¶¶ 65-66.)

The Big Boss Policy includes "an automobile liability exclusion" that specifically precludes coverage for "'entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.'" (Id., ¶ 67.) Conversely, the Big Boss Excess Policy "contains an automobile liability exclusion which does not include entrustment of automobiles to others." (Id., ¶ 68 (emphasis in original).) "However, in sections not applicable to Plaintiffs' personal injury claims, the [Big Boss Excess Policy] does exclude 'entrustment to others'

16

coverage for aircraft and watercraft . . . .”  (Id., ¶ 69.)

Furthermore:

> [The Big Boss Excess Policy] provides that "[w]ith respect to any auto . . . any person is an Insured while driving such auto or mobile equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an Insured, but only with respect to liability arising out of the operation of the auto or registered mobile equipment."
>
> The [Big Boss Excess Policy] provides coverage for Plaintiffs' claims in the Underlying [Litigation] because (1) Plaintiffs' claims in the underlying action fall within the scope of the Bodily Injury Liability Coverage of the Big Boss [Excess Policy]; (2) the [Big Boss Excess Policy] does not exclude coverage for negligent entrustment claims and provides coverage where the underlying [Big Boss P]olicy does not; and (3) in the alternative, the difference in exclusion language between the [Big Boss Policy] and [the Big Boss Excess Policy] creates an ambiguity which should be resolved in favor of coverage for the insured.

(Id., ¶¶ 70-71 (second set of brackets and ellipsis in original) (internal paragraph numbering omitted).)

Moreover, "[u]pon information and belief, by purchasing a commercial general liability policy for its business, NC Champions expected that the policy would provide coverage for all reasonably foreseeable claims against its business."  (Id., ¶ 72.)  "Upon information and belief, NC Champions relied on representations by agents of the [Harford Insurers] that it had insurance which would cover its business from any reasonably foreseeable claims."  (Id., ¶ 73.)  The NC Champions Policy "includes an endorsement for Hired

17

Auto and Non-Owned Auto Liability, Endorsement GLHM02." (<u>Id.</u>, ¶ 74.) In addition,

> [t]he Hired Auto and Non-Owned Auto Liability endorsement extends coverage to "'bodily injury' or 'property damage' arising out of the maintenance or use of a 'hired auto' by you or your employees in the course of your business" and "arising out of the use of any 'non-owned auto' in your business by any person other than you."

(<u>Id.</u>, ¶ 75 (formatting corrected on initial apostrophe).) "The endorsement defines 'hired auto' as 'any "auto" you lease, hire, or borrow' and a 'non-owned auto' as 'any "auto" you do not own, lease, hire, or borrow which are used in connection with your business.'" (<u>Id.</u>, ¶ 76.) "Hired Auto and Non-Owned Liability coverage would provide coverage for NC Champions under the facts of the Underlying [Litigation]." (<u>Id.</u>, ¶ 77.)

The NC Champions Policy "provides that the Hired Auto and Non-Owned Liability [E]ndorsement became effective on February 11, 2019, and that it became an amendment to the policy." (<u>Id.</u>, ¶ 78.) "The policy also states that Harford Mutual will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury that 'occurs during the policy period.'" (<u>Id.</u>, ¶ 79.) The NC Champions Policy "has a policy period of 10/17/2018 to 10/17/2019. The motor vehicle wreck occurred on 10/27/2018 and falls within the policy period. Because of this, the Hired Auto and Non-Owned Liability coverage applies to this claim." (<u>Id.</u>, ¶ 80.) Lastly,

18

> [i]n the alternative, to the extent that the [Harford
> Insurers] argue the [E]ndorsement did not apply to
> incidents occurring on October 27, 2018, the language in
> the policy regarding whether Hired Auto and Non-Owned
> Liability coverage applies to the policy period and date
> of the incident is ambiguous and must be construed in
> favor of coverage for the insured.

(Id., ¶ 81.)

For their part, Defendants deny that coverage exists under either the Big Boss Excess Policy or the NC Champions Policy. (See, e.g., Docket Entry 25, ¶¶ 53, 68, 77-81.)  Specifically, Defendants assert that, notwithstanding its omission of "the phrase 'entrustment of automobiles to others,'" the Big Boss Excess Policy's automobile liability exclusion "excludes bodily injury arising out of the operation or use of an automobile that was entrusted to others." (Id., ¶ 68.)  Defendants further maintain that, as to the NC Champions Policy, "[t]he Hired and Non-Owned Auto Liability coverage [E]ndorsement was not retroactive" and thus does not cover the underlying motor vehicle accident. (Id., ¶ 77.)

Accordingly, Plaintiffs and Defendants filed cross motions for judgment on the pleadings, respectively seeking a declaratory judgment that coverage exists and does not exist under the Big Boss Excess Policy and NC Champions Policy. (See generally Docket Entries 28-30.)

19

## DISCUSSION

### I. Relevant Standards

### A. Rule 12(c) Standards

In evaluating a motion under Rule 12(c) of the Federal Rules of Civil Procedure (the "Rules"), the Court "consider[s] the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, and whatever is central or integral to the claim for relief or defense." In re Coloplast Corp. Pelvic Support Sys. Prod. Liab. Litig., 219 F. Supp. 3d 577, 579 (S.D. W. Va. 2016) (brackets and internal quotation marks omitted); see also Hartford Cas. Ins. Co. v. Davis & Gelshenen, LLP, 801 F. App'x 915, 916 (4th Cir. 2020) (explaining that, in reviewing Rule 12(c) motion, court considers pleadings and "documents attached to the complaint or motion so long as they are integral to the complaint and authentic" (internal quotation marks omitted)). In so doing, the Court (i) takes all factual allegations in the Amended Complaint as true, (ii) takes all factual allegations in the Answer as "true only where and to the extent they have not been denied or do not conflict with the [Amended C]omplaint," and (iii) draws all reasonable inferences in favor of the nonmoving party. Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011) (internal quotation marks omitted). "The test applicable for judgment on the pleadings is whether or not, when viewed in the light most favorable to the

20

party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law." Id. (internal quotation marks omitted).

### B. Insurance Policy Interpretative Standards

"'Pursuant to North Carolina law,' which the parties do not dispute applies here, 'the interpretation of an insurance policy is a question of law' for the court." Hartford Cas., 801 F. App'x at 916 (quoting State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am., 343 F.3d 249, 254 (4th Cir. 2003)). "Under North Carolina law, '[t]he primary goal [of the court] in interpreting an insurance policy is to discern the intent of the parties at the time the policy was issued.'" Peace Coll. of Raleigh, Inc. v. American Int'l Specialty Lines Ins. Co., No. 5:09-cv-479, 2010 WL 3743539, at *6 (E.D.N.C. Sept. 16, 2010) (brackets in original) (quoting Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004)). "A policy with plain and unambiguous terms will be enforced according to those terms, and a policy with terms that are uncertain or capable of several interpretations will be construed in favor of the policyholder." Id.; accord Register, 358 N.C. at 695, 599 S.E.2d at 553.[11]  Further,

_____

11   According to the North Carolina Supreme Court:

An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.  An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case

21

> [i]t is well settled that a contract is construed as a
> whole. The intention of the parties is gleaned from the
> entire instrument and not from detached portions.
> Individual clauses are to be considered in context. All
> parts of the contract will be given effect if possible.
> Th[e North Carolina] Court [of Appeals] has long
> acknowledged that an interpretation which gives a
> reasonable meaning to all provisions of a contract will
> be preferred to one which leaves a portion of the writing
> useless or superfluous.

Southern Seeding Serv., Inc. v. W.C. Eng., Inc., 217 N.C. App. 300,

305, 719 S.E. 2d 211, 215 (2011) (internal quotation marks omitted)

(brackets in original).

As the North Carolina Supreme Court has explained:

> As with all contracts, the object of construing an
> insurance policy "is to arrive at the insurance coverage
> intended by the parties when the policy was issued."
> Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 276
> N.C. 348, 354, 172 S.E.2d 518, 522 (1970) (citations
> omitted). . . . We construe all clauses of an insurance
> policy together, "if possible, so as to bring them into
> harmony." 276 N.C. at 355, 172 S.E.2d at 522 (citation
> omitted). We deem all words "to have been put into the
> policy for a purpose," and we will give effect to each
> word if we can do so "by any reasonable construction."
> Id. (citation omitted).
>
> Th[e North Carolina Supreme] Court resolves any
> ambiguity in the words of an insurance policy against the
> insurance company. 276 N.C. at 354, 172 S.E.2d at 522

---

> create more than one reasonable interpretation of the
> contractual provisions. In interpreting the language of
> an insurance policy, courts must examine the policy from
> the point of view of a reasonable insured. "Where the
> immediate context in which words are used is not clearly
> indicative of the meaning intended, resort may be had to
> other portions of the policy and all clauses of it are to
> be construed, if possible, so as to bring them into
> harmony."

Register, 358 N.C. at 695, 599 S.E.2d at 553 (citations omitted).

22

(citations omitted). We do so because the insurance company is the party that selected the words used. Id. Furthermore, th[e North Carolina Supreme] Court "construes liberally" insurance policy provisions that extend coverage "so as to provide coverage, whenever possible by reasonable construction," State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986) (citations omitted), and we strictly construe against an insurance company those provisions excluding coverage under an insurance policy, id. (citing Wachovia Bank & Tr., 276 N.C. at 355, 172 S.E.2d at 523).

However, we only apply the preceding rules of construction when a provision in an insurance agreement is ambiguous. Wachovia Bank & Tr., 276 N.C. at 354, 172 S.E.2d at 522. To be ambiguous, the language of an insurance policy provision must, "in the opinion of the court, be fairly and reasonably susceptible to either of the constructions for which the parties contend." Id. (citation omitted). If the language is not "fairly and reasonably susceptible" to multiple constructions, then we "must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Id. (citations omitted).

Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C., 364 N.C. 1, 9-10, 692 S.E.2d 605, 612 (2010) (brackets omitted).

Finally, "[t]he insured has the burden of bringing itself within the insuring language of the policy." Builders Mut. Ins. Co. v. Mitchell, 210 N.C. App. 657, 660, 709 S.E.2d 528, 531 (2011) (internal quotation marks omitted). However, "[i]f it is determined that the insuring language embraces the particular claim or injury, the burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." Id., 709 S.E.2d at 531 (internal quotation marks omitted). "If the

23

insurer is successful, the burden shifts back to the insured to 'prov[e] that an exception to the exclusion exists and applies to restore coverage.'" <u>Hartford Cas.</u>, 801 F. App'x at 917 (brackets in original) (quoting <u>Home Indem. Co. v. Hoechst Celanese Corp.</u>, 128 N.C. App. 189, 202, 494 S.E.2d 774, 783 (1998)).

## II. Analysis

As a preliminary matter, the parties do not dispute the amount of money due under the Big Boss Excess Policy and NC Champions Policy, if coverage exists. (<u>See, e.g.</u>, Docket Entry 34 at 14 n.2 ("The amount of coverage under any policy is not in dispute and has been clearly established by stipulation. The only dispute is whether coverage exists at all.").) Moreover, the parties dispute only whether the Automobile Exclusion precludes otherwise existing coverage under the Big Boss Excess Policy and whether the timing of the Endorsement precludes coverage that it would otherwise provide under the NC Champions Policy (i.e., whether the Endorsement provides retrospective or only prospective coverage). (<u>See</u> Docket Entries 28-31, 33-34, 36-37.) Finally, because they urge an exception to coverage, Defendants bear the burden as to coverage under the Big Boss Excess Policy, but because they urge application of a provision extending coverage, Plaintiffs bear the burden as to the NC Champions Policy. <u>See Hartford Cas.</u>, 801 F. App'x at 917.

24

## A. The Big Boss Excess Policy

Relying on the distinction in language between the Automobile Exclusion and the Aircraft/Watercraft Exclusion, Plaintiffs assert that the plain language of the Big Boss Excess Policy provides coverage for their negligent entrustment claim against Big Boss. (See, e.g., Docket Entry 31 at 13-14.) Defendants respond that "Plaintiffs' comparison of exclusions within the same policy is unnecessary because the plain language of the Automobile Exclusion is unambiguous and excludes coverage." (Docket Entry 36 at 2 (emphasis omitted); see also id. ("The plain language of the Big Boss Excess Policy Automobile Exclusion is clear and unambiguous, and thus, requires no analysis with regard to Plaintiffs' alleged ambiguity.").)[12] The Court agrees with Plaintiffs' position.

The Big Boss Excess Policy's Aircraft/Watercraft Exclusion explicitly excludes coverage for injuries "arising out of the ownership, maintenance, operation, use, loading or unloading or entrustment to others of any aircraft, unmanned aircraft or watercraft." (Docket Entry 22-4 at 29 (emphasis omitted) (emphasis added).) By contrast, the Automobile Exclusion only excludes coverage for injuries "arising out of the ownership, maintenance, operation, use, loading or unloading of any automobile." (Id. at

_____

12  In so arguing, Defendants neither acknowledge nor address fundamental contract principles that require construing all clauses of a contract together, giving effect to each word, and avoiding constructions that render portions of a contract superfluous. (See id. at 2-3.)

25

48 (emphasis omitted) (emphasis added).) "[I]t is well settled that a contract is construed as a whole." Southern Seeding, 217 N.C. App. at 305, 719 S.E. 2d at 215 (internal quotation marks omitted). Moreover, the Court must (i) "construe all clauses of an insurance policy together, 'if possible, so as to bring them into harmony,'" (ii) "deem all words 'to have been put into the policy for a purpose,'" and (iii) "give effect to each word if [it] can do so 'by any reasonable construction.'" Harleysville, 364 N.C. at 9, 692 S.E. 2d at 612.

Defendants assert that the "use," "operation," and/or "ownership"[13] provisions in the Automobile Exclusion cover Plaintiffs' negligent entrustment claim because "the injuries in question arose out of the operation and use of the Big Boss automobile by Mr. Ramirez" (Docket Entry 29 at 8). (See, e.g., id. at 8-13.)[14] However, the Aircraft/Watercraft Exclusion also

---

13 Defendants focus primarily on the "use" and "operation" provisions (see, e.g., Docket Entry 36 (relying exclusively on said provisions); see also Docket Entry 29 at 8-9 (same); Docket Entry 34 at 7-12 (same)), but also assert, at least in passing, that the "ownership" provision applies (see Docket Entry 29 at 10-13; Docket Entry 34 at 6).

14 Defendants rely heavily upon authorities extending coverage, rather than excluding coverage, in support of their argument for a broad reading of the Automobile Exclusion. (See, e.g., id. at 9.) Yet, the Court must "construe[] liberally insurance policy provisions that extend coverage so as to provide coverage, whenever possible by reasonable construction," and "strictly construe against an insurance company those provisions excluding coverage under an insurance policy." Harleysville, 364 N.C. at 9-10, 692 S.E.2d at 612 (internal quotation marks omitted); see also State Cap. Ins., 318 N.C. at 538, 350 S.E.2d at 68 ("It is

26

proscribes coverage for "use," "operation," and "ownership" of the relevant vehicle, in addition to "entrustment to others" of said vehicle. (Docket Entry 22-4 at 29.) To adopt Defendants' argument that the "use," "operation," and "ownership" language necessarily encompasses "entrustment" claims would impermissibly render meaningless the "entrustment" clause of the Aircraft/Watercraft Exclusion. See, e.g., American Fed'n of Musicians v. Atlantic Recording Corp., 203 F. Supp. 3d 301, 310 (S.D.N.Y. 2016) (rejecting the plaintiffs' contract interpretation in part because it "would render other language in the contract meaningless," and explaining: "If simply stating that audio streams or ringbacks 'are covered by' a contract was sufficient to impose future payment obligations under that contract, as asserted by [the p]laintiffs, then there would be no need to state that 'payments shall be made pursuant to' the 1994 MOA or the 2006 MOU in ¶ 1(l). Thus, [the p]laintiffs' proffered interpretation of ¶ 1(k) would render the clause 'payments shall be made pursuant to' in ¶ 1(l) superfluous. But it is 'basic contract law' that 'an interpretation of a contract that has the effect of rendering at least one clause

_____

particularly important in the instant case to recognize that different rules of construction govern the interpretation of policy provisions which _extend_ coverage as opposed to policy provisions which _exclude_ coverage." (emphasis in original)). In any event, Defendants fail to offer any authority involving a situation such as this, where one provision of the insurance contract specifically addresses "entrustment" of a vehicle and another refers only to "use," "operation," and "ownership" of a vehicle. (See Docket Entries 29, 34, 36.)

27

superfluous or meaningless is not preferred and will be avoided if possible.'"); see also RLI Ins. Co. v. Nexus Servs. Inc., 470 F. Supp. 3d 564, 583–84 (W.D. Va. 2020) ("[T]he court considers the arguments each side makes as to the nature of the obligations imposed by ¶ 3.d. Each side advances an extreme position, neither of which are reasonable or consistent with the whole of the Indemnity Agreement. . . . RLI specifically uses the language 'in its sole discretion' in ¶ 3.b., reserving the right to issue, cancel, or decline the execution of any Bond. But this language is not found in ¶ 3.d. The court is required to give meaning to the words chosen by the parties in the contract, and attributes significance to the fact that ¶ 3.d. does not contain the 'sole discretion' language of ¶ 3.b. . . . At the same time, however, standard tenets of contract interpretation compel the court to reject Nexus's contention that ¶ 3.d. merely reiterates rights granted to RLI in ¶ 2.a.(ii). A foundational principle of contract interpretation is that a court must construe a contract as a whole to give meaning to every term and provision in order to effectuate the parties' intentions.").

The Court therefore concludes that, by its plain language, the Big Boss Excess Policy's Automobile Exclusion does not preclude coverage for Plaintiffs' negligent entrustment claim against Big Boss. See Southern Seeding, 217 N.C. App. at 305, 719 S.E. 2d at 215 (explaining that, in construing contracts, "[a]ll parts of the

28

contract will be given effect if possible" and that "an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous" (internal quotation marks omitted)); see also Fidelity & Cas. Co. of N.Y. v. North Carolina Farm Bureau Mut. Ins. Co., 16 N.C. App. 194, 197, 192 S.E.2d 113, 117 (1972) ("The terms 'ownership, maintenance or use' should not be treated as mere surplusage.  They were placed in the policy in order to cover situations distinct and separate from any other term.").  Thus, the Court will grant Plaintiffs' Motion as to the Big Boss Excess Policy.[15]

**B. NC Champions Policy**

Next, Plaintiffs contend that, under the Endorsement, the NC Champions Policy provides coverage for their claims against NC Champions.  (See, e.g., Docket Entry 31 at 19-21.)  Defendants counter that, "[b]ecause the accident occurred before the

_____

[15]  In the Amended Complaint, Plaintiffs seek, in addition to a declaratory judgment regarding coverage, "[p]re-judgment and post-judgment interest as provided by law."  (Docket Entry 22 at 17.)  In turn, Plaintiffs' Motion seeks both a ruling that the Big Boss Excess Policy and NC Champions Policy "provide coverage for Plaintiff[s'] injuries in the amount of the policy limits or $3,000,000," as well as "such other and further relief as the Court deems just and proper."  (Docket Entry 30 at 3.)  Although they concede Plaintiffs' entitlement to $2 million in coverage under the Big Boss Excess Policy, if coverage exists (see Docket Entry 34 at 14 n.2), Defendants do not address the interest issue in their briefing on the Motions (see Docket Entries 28-29, 34, 36).  The Court will therefore direct Defendants to show cause why the judgment should not include interest.

29

[Endorsement] was effective, coverage is not available under the Endorsement." (Docket Entry 29 at 14.)[16] On this issue, Plaintiffs' arguments fall short.

Per Plaintiffs,

> [t]he NC Champions policy provides that the Hired Auto and Non-Owned Auto Liability [E]ndorsement became an amendment to the policy February 11, 2019. The policy also states that Harford Mutual will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury that "occurs during the policy period." The policy period is October 17, 2018, through October 17, 2019. The wreck occurred on October 27, 2018, and therefore fell within the policy period. Because of this, the Hired Auto and Non-Owned Auto Liability coverage applies to this claim.

(Docket Entry 31 at 20 (citations omitted).)

Alternatively, "[t]o the extent that Harford Mutual may contend that the Hired Auto and Non-Owned Auto Liability coverage applies only to claims between February 11, 2019, and October 17, 2019," Plaintiffs contend that "[t]he policy is ambiguous and must be construed in favor of coverage." (Id.) More specifically, Plaintiffs assert:

> The NC Champions policy is ambiguous because, on one hand, it says that it will cover claims that occur during the policy period but, on the other hand, it says that the Hired/Non-Owned Auto [E]ndorsement is "effective on February 11, 2019." The policy does not state that the

_____

16 As Plaintiffs note, "[o]ther than the issue of when the [E]ndorsement became effective, Defendants do not dispute the Hired Auto and Non-owned Auto Liability insurance would provide coverage based on the facts" (Docket Entry 33 at 22 n. 3). (See Docket Entry 29 at 14-15; Docket Entry 34 at 14-15; Docket Entry 36 at 7.)

[E]ndorsement only applies to claims made after February 2019.

(Id. at 20-21.)  Plaintiffs elaborate:

> Defendants argue that the [E]ndorsement does not apply because the declarations page states the [E]ndorsement is effective February 11, 2019.  However, this language conflicts with the policy terms providing coverage for bodily injury which "occurs during the policy period" (covering the date of the wreck).  [The] policy does not contain language clarifying this conflict — whether the period of the [E]ndorsement or main policy controls, and whether the Hired Auto and Non-Owned Auto Liability [E]ndorsement applies retroactively for the policy period, or prospectively only as Defendants argue.

(Docket Entry 33 at 22-23.)  Finally, Plaintiffs emphasize that "[t]he substance of the Hired Auto/Non-Owned [E]ndorsement itself does not contain any language to suggest that it is effective after Plaintiffs' injuries.  In fact, the [E]ndorsement simply says that '[t]his endorsement modifies insurance provided under the following:  COMMERCIAL GENERAL LIABILITY COVERAGE PART.'" (Docket Entry 37 at 11 (all-cap font and final set of brackets in original).)

Defendants respond that the Endorsement "was not in effect on October 27, 2018, and is, therefore, irrelevant to the analysis of coverage for Plaintiffs' claims here."  (Docket Entry 29 at 14.)  Per Defendants, "[b]ecause the accident occurred before the Hired Auto and Non-Owned Auto Liability Endorsement was effective, coverage is not available under the Endorsement."  (Id.)  Defendants further assert that "Plaintiffs' attempt to claim that

31

the Hired Auto and Non-Owned Auto Liability Endorsement is ambiguous misses the mark." (Id.)  According to Defendants,

> [t]he effective date of an endorsement, unlike the wording of a policy, is binary.  An occurrence either takes place before the effective date or after.  The endorsement either applies or does not.  Here, the motor vehicle accident clearly took place four months before the effective date of the Hired Auto / Non Owned Auto Liability Endorsement's effective date of February 11, 2019.  There is no ambiguity, the Endorsement does not apply.

(Id. at 14-15.)

Notably, the parties cite no cases involving similar factual circumstances.  (See Docket Entries 29, 31, 33-34, 36-37.) However, this Court found a decision from Oregon involving analogous circumstances.  See Capitol Specialty Ins. Corp. v. Chan & Lui, Inc., 248 Or. App. 674, 274 P.3d 238 (2012).  In that case, four months after an intoxicated customer caused a wreck that killed two individuals, a restaurant and insurance company increased by $2 million the limits on the restaurant's "'liquor liability'" coverage, which "insur[ed] the [restaurant's] owners in the event that they were found to be liable for serving alcohol to a customer who subsequently harmed others."  Id. at 677, 274 P.3d at 239.[17]  As here, the insurance policy spoke in terms of coverage

---

17  The restaurant owners and insurance company effectuated this change by "add[ing] $2 million in 'umbrella coverage' to the liquor liability coverage."  Id. at 678, 274 P.3d at 239.

for injuries during the policy period. See id., 274 P.3d at 239.[18] The policy period for the insurance policy spanned from March 24, 2007, to March 24, 2008. Id., 274 P.3d at 239. The Policy Change Endorsement for the increase in the liquor liability amount identified the same policy period but stated, "'EFFECTIVE DATE OF CHANGE: 8/27/2007.'" Id. at 678, 274 P.3d at 239 (all-cap font in original).[19]

After the decedents' estates collectively obtained, via a settlement agreement, a $3 million judgment against the restaurant owners, the insurance company sued, "seeking a judicial declaration that the $2 million umbrella coverage did not apply retroactively to the date of the accident." Id. at 679, 274 P.3d at 240. "The estates argued that the umbrella coverage was retroactive to the beginning of the policy period, March 24, 2007," relying, as

---

18  Specifically:

> The policy provided, among other things, that [the insurance company] "will pay those sums that the insured becomes legally obligated to pay as damages because of 'injury' to which this insurance applies[,] if liability for such 'injury' is imposed on the insured by reason of the selling, serving[,] or furnishing of any alcoholic beverage." Further, such "injury" must have "occur[ed] during the policy period * * *." The liquor liability policy limit was $1 million.

Id., 274 P.3d at 239 (ellipsis and all but first set of brackets in original).

19  The effective date of change predated the date upon which the restaurant owners and insurance company agreed upon the Policy Change Endorsement. See id., 274 P.3d at 239.

33

relevant here, "on the fact that the headings on the endorsement and declarations pages unambiguously stated the 'POLICY PERIOD' was '03/24/2007 [to] 03/24/2008,' which encompassed the date of the accident, and that the policy provided coverage for injuries that occur during the 'policy period.'" Id., 274 P.3d at 240 (all-cap font and brackets in original). The insurance company, "for its part, relied primarily on the statement that the 'EFFECTIVE DATE OF CHANGE' was after the accident that killed the estates' decedents . . . ." Id., 274 P.3d at 240 (all-cap font in original).

The Oregon court rejected the estates' interpretation of the insurance contract, concluding that the insurance company's "interpretation that the liquor liability umbrella coverage was intended to cover injuries only after August 27, 2007, is the only plausible interpretation of the policy language," and thus that "the umbrella policy issued September 14, 2007, did not retroactively fully cover the estates' damages." Id. at 682, 274 P.3d at 241-42. In reaching this conclusion, the Oregon court explained:

> It is true, as the estates argue, that the term "policy period" is unambiguous; it means the chronological period during which the policy at issue is operative. But the fact that a policy is in existence and forms a contract between the insured and the insurer does not, by any means, necessarily mean that every type of coverage or every policy limit that is in existence at one time during the policy period remains in existence during the entire period and cannot be changed by the mutual agreement of the parties. Thus, there is no conflict between the provision stating the term of the policy period and the policy change endorsement that lists

34

mutually agreed-upon changes and states when they take effect . . .

          *****

          [The insurance company's] explanations of the "policy period" language . . . are straightforward and plausible. The "policy period" information, along with the named insured, the agent, and the policy number, together comprise identifying information for the original policy that was modified by the endorsement, and those modifications went into effect on the "EFFECTIVE DATE OF CHANGE: 8/27/2007," after the fatal accident. The period simply represents the length of the contractual relationship between the insured and the insurer . . . . If the term "policy period" had the meaning that the estates attribute to it, then the "effective date" language could have no meaning at all. Thus, the estates' interpretation of the policy renders a conspicuous provision superfluous, while [the insurance company's] interpretation does not.

Id. at 680-81, 274 P.3d at 241.

This reasoning applies with equal force here. In addition, although neither Plaintiffs nor Defendants discuss this fact, the NC Champions Policy explicitly envisions retroactive effective dates for endorsements. (See Docket Entry 22-2 at 35.) Specifically, in a section entitled "Important Policyholder Information Concerning Billing and Policy Fees" (id. (all-cap font and emphasis omitted)), the NC Champions Policy provides:

          Endorsements: All endorsements, both additional and return premiums, will be spread over the remaining installment payment periods based on the effective date of the endorsement. If an endorsement is processed with a retroactive effective date, the impact on the next billing statement will be greater than the impact on the remaining installments.

35

(Id. (emphasis omitted) (emphasis added).)  That the NC Champions Policy acknowledges the ability to establish a retroactive effective date for an endorsement but does not include a retroactive date for the Endorsement further supports the conclusion that the Endorsement does not provide (retroactive) coverage for the underlying accident.  See, e.g., Harleysville, 364 N.C. at 9, 692 S.E.2d at 612 ("We deem all words to have been put into the policy for a purpose, and we will give effect to each word if we can do so by any reasonable construction." (internal quotation marks omitted)).

Nevertheless, perhaps relying on the concept that a court's primary goal "in interpreting an insurance policy is to discern the intent of the parties at the time the policy was issued," Register, 358 N.C. at 695, 599 S.E.2d at 553, Plaintiffs contend:

> Hired/Non-Owned Auto Liability coverage is the exact insurance that NC Champions needed for Plaintiffs' claims, and it was purchased an entire year before Plaintiffs[] filed their lawsuit against NC Champions in Randolph County Superior Court and nearly two years before Defendant Harford Mutual denied coverage.  It does not make sense that NC Champions would have purchased the insurance if it would not provide coverage.

(Docket Entry 31 at 21.)

Although NC Champions may well have wished for retroactive coverage of the accident, Plaintiffs' argument lacks merit.  Having become aware of the risk of such accidents, it "make[s] sense" (id.) for NC Champions to obtain coverage for any such future incidents, regardless of whether retroactive coverage existed.

36

Moreover, Defendants have at least an equally valid argument that the notion that they would amend the insurance policy to provide retroactive coverage for an accident with catastrophic injuries "does not make sense" (id.). In any event, the Court "must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Harleysville, 364 N.C. at 10, 692 S.E.2d at 612 (internal quotation marks omitted).

Under the circumstances, including the fact that Plaintiffs bear the burden of showing coverage exists, see Hartford Cas., 801 F. App'x at 917, the Court will grant Defendants' Motion as to the NC Champions Policy.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Motions (Docket Entries 28, 30) are **GRANTED IN PART** and **DENIED IN PART** as follows: judgment shall be entered in Plaintiffs' favor for $2 million under the Big Boss Excess Policy, but Plaintiffs shall take nothing under the NC Champions Policy.

**IT IS FURTHER ORDERED** that, on or before April 10, 2023, Defendants shall show cause why the judgment should not include pre-judgment and post-judgment interest. On or before April 24, 2023, Plaintiffs may submit a response to Defendants' filing,

showing the appropriateness of such interest.  On or before May 1,

2023, Defendants may file a reply to Plaintiffs' response.

This 27th day of March, 2023.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**
